May it please the Court, Attorney Thaddeus J. Stauber of Nixon Peabody on behalf of the Appellant. I will also be speaking on behalf of both the Thyssen-Bornemisza Collection Foundation and the Kingdom of Spain today. Attorney William Barron sends his regards. The application of the no-exhaustion-and-it-does-not-matter-who-violated-international-law approach taken at the District Court leads to the following. Assume the allegations as true as pled in Mr. Casirer's complaint, and assume that the Thyssen-Bornemisza Foundation exchanged the Pissarro with the National Gallery of Art in London, an agency or instrumentality of the UK, for a Monet painting. The National Gallery of Art in London then exchanges that Monet painting with the National Gallery of Art in Canada for a Magritte painting, which is in the National Gallery of Canada also being an agency or instrumentality of the Canadian government. Now, also assume that all three of these engage in exhibitions and art loans with the U.S. museums without first seeking redress against the German government, the government, the successor government that offended. May I interrupt you? Is there anything in any of your papers that points the way to a remedy which Casirer could get in Spain? Is there anything in our papers which points to a remedy which Mr. Spain could get? Is there a court there that could adjudicate this? The National Court of Spain? Is it the Court of the Autonomous Province of Madrid? What is there in Spain to exhaust? The courts of Spain have a civil system that will afford Mr. Casirer the process. Where do I find that in any of your papers? That wasn't at issue at this point in time. We have pled exhaustion of remedies, and that is why we say that at this point, at a minimum, the court should remand the case back to the district court level so we can explore exactly what the remedies Mr. Casirer may or may not have in the Kingdom of Spain or with respect to the German government. So would he have to exhaust in both, Germany and Spain? One or the other? What does that mean if he has to? In the particular circumstances where we have an allegation of the violation of international law, especially where we have the low threshold at the pleading stage of it just being substantial or non-frivolous, he would then submit that the only way you can determine whether you actually have a violation of international law is to go back to the offending state and determine whether or not there was either just compensation or the offending state undid the alleged violation of international law. Counsel, as I understand it in this case, the complaint basically seeks in common law terms both damages for conversion and return of the property under raplevin theory. It seems to me that you could not exhaust for both in one country because Germany violated international law in the taking. They'd be liable for the conversion, and Spain has the paintings, so they'd be liable for raplevin. At this stage, Your Honor, we're at a jurisdictional stage. So we need to determine whether or not we actually have a violation of international law which triggers the foreign-side immunity exception of violation of international law. Well, we're determining now whether exhaustion is required, and it seems to me that in order to do that, you have to look at what the practical significance of the requirement is, and it looks impractical. Well, it's not actually impractical in this particular case, Your Honor, because first, there were many available post-war deprivation compensation processes that were undertaken. Why do we need to ask the country that violated international law putatively whether they violated international law? Why can't we ask somebody else? For example, one of the most ancient established violations of international law is piracy. But if Somalian pirates steal a painting off a cargo ship, I don't see why we can't ask a court somewhere else, like the United States, whether pirates stealing a painting off a pirate from a ship is piracy, which violates international law. Well, in that particular situation, Your Honor, you have people acting as pirates. They're not acting as agents or instrumentalities of the foreign state. In this particular unique situation where you have the allegation that it is not the Kingdom of Spain, it is not the Tizan Bornemis, it is not the defendant before you that has committed the alleged violation, as a jurisdictional matter, you first, as Judge Breyer tells us in the Altman case in his concurrence, you've got to determine if you actually have an exhaustion or if you have a violation of international law. And if you look at international comedy and you look at the standards of international law, it tells us you have to go back to first the state that committed the offense. I thought that when Congress adopted the Foreign Sovereign Immunities Act, it tried to adopt a scheme for how courts should decide whether or not a foreign state was entitled to immunity. And as I read the Foreign Sovereign Immunities Act, I don't see anything in there about exhaustion. You're right. It does not specifically say exhaustion. And as Judge Akuta pointed out in her very careful dissent, there's nothing in legislative history that suggests there's a need for exhaustion. So why should we, as judges, craft an exhaustion requirement under the Foreign Sovereign Immunities Act? The Foreign Sovereign Immunities Act, which, I will add one last point, is not at all similar. It's different. It has a different purpose than the act, than the alien tar plan statute. Well, on its face, I would concede that the Foreign Sovereign Immunities Act, by statute, does not include an exhaustion of remedies requirement. However, I think just as the majority did at the panel level here, the sorry decision does provide us some guidance as to the justification for prudential standard and exhaustion of remedies. Orrin, do you agree that what we're talking about is prudential exhaustion? Yes, I do, Your Honor. Well, if that's true, then how do we have jurisdiction even to consider it on a collateral order appeal, because prudential exhaustion is not a prerequisite to jurisdiction? I would submit that it actually is in this particular case, because it gets read right into the statute. Because Congress, in enacting the Foreign Sovereign Immunity Act, as according to the testimony of Monroe Lee, legal advisor to the State Department, chose to make the exceptions of section 1605, the exceptions, that is, of 1605 and 1607, purposefully ambiguous, having decided to put their faith in the U.S. courts and attempt to provide only very modest guidance to the judiciary. So while we do have a general framework for dealing with claims that arise under foreign sovereign immunity, we do not have a case-by-case dialogue that tells us how to handle each unique particular case. The facts and circumstances of this case are so unique that they call out for the reading of an exhaustion of remedies requirement here to first determine the appeal. If I may, I'd like to ask a version of Judge Reimer's question, assuming for purposes of my question that international law could require exhaustion in this case. I'm not sure that it does, but assuming that it could, why is that a jurisdictional prerequisite to hearing something under the Foreign Sovereign Immunity Act? Why do not we have jurisdiction with respect to the question in front of us now on the interlocutory appeal, and then it goes back to the panel to decide whether, in fact, exhaustion is required? Why do we not have jurisdictional? Could you restate that, please? This is a variation on Judge Reimer's question. We're here on an interlocutory appeal on the collateral order doctrine. We've got a fair number of cases in analogous context that tell us that the question of immunity, sometimes it's Eleventh Amendment immunity, sometimes it's tribal court immunity and so on, with an exhaustion question lurking in the background. We have decided the sovereign immunity question and said that exhaustion is not part of the collateral appeal. So why is the exhaustion question part of this collateral appeal? Why don't we simply say, if that's our answer, that there is jurisdiction under the Foreign Sovereign Immunity Act, whether exhaustion is required, we cannot decide because that's not part of the collateral order appeal. Okay. In this particular context, to determine whether you have a substantial or non-frivolous allegation of violation of international law, I would submit when you have a non-offending party for the court to determine whether you even have on its face a non-frivolous substantial violation of international law, you must first determine whether or not the international standards of affording the offending country, the country that or the state that has alleged to have violated international law, has offered up or afforded the claimant the opportunity to undo the alleged violation of international law. In this particular situation, the actual claim does not, according to the plaintiff's papers, arise out of the taking of the passaro, but is rather a more general violation of international law allegation that has to do with deprivation and discrimination against the Jewish people by the Nazis. In that particular situation, we would appear to have an ongoing, never-ending violation of international law if we don't first determine, by going back to the German state, whether or not that violation of law as it relates to the Kossira family has been undone. Let me ask you a question. Is the exhaustion question so intertwined with the subject matter jurisdiction question that it must be decided on collateral review? In this particular circumstance, it is. And I think the court can dare... I mean, look at the intertwining doctrine that there is and the law regarding it and tell me why. Because that's a big issue. Because in this particular situation, and it is a very narrow situation, and it's a situation of first impression before this Court, we have the use of the Foreign Sovereign Immunity Act exception being used as a hook, or a large net, if you will, to pull into the jurisdiction of the U.S. courts a sovereign state, not based on any acts that it has committed, but the acts of another third, unrelated party. And you can't get to subject matter jurisdiction... We really have, in the FSIA, we really have a pretty well easy guideline as to whether we have subject matter jurisdiction. The Congress has laid it out. And the common impact of statutory complex of the FSIA suggests that there is subject matter jurisdiction in this particular case. The next question, which I think you really talked about just the subject matter jurisdiction, but the next question, is it so much intertwined? Now, I realize that this case came up in a very difficult situation because the Court has no exhaustion required because of the FSIA. The problem comes, is the exhaustion of the FSIA so intertwined that we must decide it in a federal review? That's the question, which I don't think has anything to do with the facts, but analyzing them according to the intertwining law, if you will, that is applicable here as to whether it's intertwined or not. So that's my question. I understand, Your Honor. But I do think when you look at a question, you can't look at it in the abstract. You have to look at it in the specific facts that we have before us that are presented to us here. We did have, at the trial court level, a decision that said exhaustion is not there, you don't look at it, period, you stop. We never actually got to whether or not exhaustion was intertwined and whether or not we had an opportunity to establish and determine whether or not there was any violation of international law in the first place. Counsel? Yes. Judge Gould, with a question for you. Before we address exhaustion, don't we have to first decide whether 1605A3 applies at all when Spain was not the country that allegedly violated the international law by seizing the painting? Absolutely, Your Honor, and that is one of our very threshold points. The expropriation exception is based on the general presumption that states abide by international law, and hence violations of international law are not sovereign acts. That's cited in West Malte Blanco, Ninth Circuit. Here, since there are no allegations that either the Kingdom of Spain or the Peace in Buenos Aires The statute, though, is a little bit different and unique. It says immunity is not available in a case in which rights in property taken in violation of international law. It doesn't say by the country. No, it doesn't explicitly state that. It doesn't explicitly state by that, but by implication it is required. I don't see the implication. For one thing, you've got the passive voice, rights in property taken in violation of international law. That would suggest taken by anyone, my hypothetical pirates or anyone else, not necessarily the state that's getting sued. Also, it strikes me that there is a fairly obvious and common analogy to this somewhat unusual case, a pawn shop with a stolen guitar that the thief pawned. It isn't necessary for the person trying to get his guitar back to sue the thief. He can sue the pawn shop, and he puts on proof it's his guitar, and he never passed title. And if the pawn shop wants to prove that the thief was, in fact, not a thief and had good title, it can use that to try to defeat the plaintiff's claim. The Kingdom of Spain is in the position of the pawn shop here, not the thief. No one's trying to prove that Spain stole the painting, and the statute doesn't seem to require it because it's written in the passive voice. Well, Your Honor, I would submit that you have actually two very different situations you've described there. One is that if you have a pawn shop here in the United States, and you argue that you cannot obtain good title to stolen property, that's U.S. law. That is, in fact, it's not U.S. law that's uniform. In Louisiana, we have a coercive prescription where, in fact, a property owner can obtain good title to stolen property merely by holding it for a certain period of time. But here it has to be taken in violation of international law, not state law. Right. And so you have a very – you cannot ignore international principles of law, which say in order to determine if something has been taken in violation of international law, you have to look at the offending state. Well, that doesn't seem to go to the – I don't see why that goes to the exhaustion issue. Well, the exhaustion issue, as Judge Breyer tells us in the Altman case, which was also a World War II restitution case. It was a throwaway line of concurrence. Of concurrence, yes. It's not a majority opinion. And he doesn't – even Justice Breyer doesn't commit himself to the view that exhaustion would be required, and that it might be. I'm not submitting that it is the majority view. But I think it provides us with a starting point. We don't even know if it's Justice Breyer's view. Excuse me? We don't even know if it's Justice Breyer's view. He just tosses it out as a possibility. Okay. So we take that possibility, and we look at the purpose of the expropriation exception. And that is – Are you taking the position that this Court has jurisdiction, pendent appellate jurisdiction to determine whether the FSIA expropriation exception requires exhaustion? Or are you also saying that it – we also have jurisdiction to determine whether CASRA's underlying claims require exhaustion? I'm saying that in order – we're at the jurisdictional stage here. We're looking at the alleged violation of international law. So that's what we have to focus on. And his violation of international law is not the – he's not saying the taking without compensation. He is saying the acts of the Germans, the acts of the Nazis, with respect to the discrimination. So we have to look at that as a – at a threshold. So that we have pendant jurisdiction to determine whether FSIA expropriation exception requires exhaustion. Is that what you're saying, we have jurisdiction? Yes. You're not saying that we have jurisdiction to determine whether CASRA's underlying claims require exhaustion? No. That's not at issue here before the Court. May I address the separate opinion by Justice Breyer in the Altman case? He has two examples of expropriation cases in which exhaustion might be required. One is a country making a claim against another country on behalf of a citizen, which is not the case here. Right. And the other one is an individual making a takings claim. And he cites two domestic cases, both of which are takings claims in the sense that the defendant charged with the taking has the legal right to take it provided it pays compensation. This is not such a case. Right. That is to say, Nazi Germany had no right to take these cases, this painting, even if it did pay compensation. So I have trouble seeing how this case fits into either example Justice Breyer gave of possibility of exhaustion being required. Can you help me on that? Well, with respect to World War II and with respect to compensation coming out of the war for the acts of the Nazis, there was a very complex and a very well-developed restitution and compensation possibility. That's not my question. My question is, if we assume that the Nazis had no right to take this painting forcibly, even if they paid compensation, why is there exhaustion under the examples given by Justice Breyer in his Altman concurrence? Okay. Because you cannot have an ongoing, never-ending violation of international law. At some point, the violation is a single act, and the offending State has an opportunity to either rectify that, undo that, or compensate that act. What we are simply saying is in this particular situation. I'm not sure I got an answer. Do you have case law that tells us that exhaustion is required when there's expropriation that is not a taking in the sense that the country is entitled to take it if it pays compensation? No, we do not. But we do have the resplendent case law that tells you, that directs you to first back to the offending State for a violation of international law, to afford them the opportunity to try to address the alleged taking. Okay. But in the cases you cite, I don't see any of them that address the facts of the case here, where the expropriating country had no right whatsoever to take it, even if it paid compensation. And this is in a particularly and a very unique scenario that we have here. In other words, you don't have case law directly on point. Not directly on that point, Your Honor. What if we change the facts and the Kingdom of Spain had bought these from pirates, from thieves, pirates, and Mr. Cacero, who was one of the living heirs of the time, comes to the Kingdom and says, these are my paintings, I want to take them home with me. And they say, no, they're ours. So there's no State involved there. They were stolen, robbed, you know, somehow they were taken by private parties. Right. But they're now in the hands of the State. Right. And the State is refusing to give them back. Is there an exhaustion requirement there? Well, the exhaustion requirement just tells us whether we look at the viability of exhaustion. In that particular situation, you would look at the exhaustion, determine whether or not it's even viable or if it's just a futile exercise. And the Court tells us we don't do that. Do you have an answer for me? Excuse me? Do you have an answer to my question? Why don't you start with a yes or a no. Yes. Yes, exhaustion would be required in that particular situation. And how would you affect exhaustion in that case? You would look to see whether, in fact, that exhaustion provided a viable remedy. Since in that particular situation, where there is no successor State and there is no way to undo the violation, you would say it's futile, and then you would move forward. Why wouldn't you go to the Kingdom of Spain and say, look, you have my painting. I ask for compensation on my painting back. Why isn't that a requirement under your scheme? You would go first to determine whether or not the taker could provide you with viable compensation to undo the offense. If that's not the case, as you point out, Judge, with respect to the pirates, your next step would go to the Kingdom of Spain and say, I would like to bring my case against the Kingdom of Spain. It is a civil country that affords due process regardless of citizenship. Why do you have to start with the taker? It's fundamental in property law that no one can get good title from a thief. Even a BFP can't get good title from a thief. No one has to prove that Spain has violated international law. That is fundamental law in the United States, in certain States. But as I point out, that is not necessarily the law of the entire world. Here in the United States, in Louisiana, one can't acquire a good title to stolen property. So my point here is that you have to, under international comedy, you have to look to and afford the states that are being stripped of their foreign sovereign immunity the opportunity to try to address the claim. Particularly in a situation as unique as this. But no one here is trying to strip Germany's sovereign immunity. I mean, they are not involved. They are not the defenders here, are they? They are not, because the plaintiff is chosen. So nobody is trying to strip them off. I mean, what happens between Spain and Germany or whoever Spain bought the paintings from, that's no particular interest. But nobody is trying to strip Germany of its sovereign immunity. So why would they have any, would there be any exhaustion as to them? Because it is only Germany, it is only Germany, the offending state under international law, that can undo the violation of international law or compensate for the violation of international law. Spain cannot do that. Certainly a good thing for Spain to try to get done through its diplomatic channels, you know, country to country, and say, hey, we bought this painting from you, you know, you're embarrassing us, go do it right. Certainly could do it, but at stake here is not Germany's sovereign immunity in any way. It's not implicated if a plaintiff wins this lawsuit, Germany's sovereignty will remain totally intact. So why does its exhaustion require, it might have, or avenues of exhaustion it might have, give any particular interest under the Sovereign Immunity Act? Because to determine whether we have a substantive non-frivolous violation of international law, you first have to go to the offending state to determine whether we still have an ongoing violation of international law. Otherwise, what you've turned the expropriation exception into is a super property, a stolen property statute. And I would submit if that's what this Court thinks it is, based on a reading of the statute, then you will turn the U.S. courts into an international court of plaintiffs. And Spain has already agreed to the international law principle. They signed international conventions and resolutions, as I recall, to return parts confiscated by the Nazis to the Jewish owners. We don't have here an allegation that Spain has violated any international law. And furthermore, as this Court in the Ninth Circuit has found, the various guidelines that have been signed and the various approaches that have been taken are diplomatic. They do not create a cause of action here in the United States or anywhere else with respect to objects coming out of World War II planes. Why are you wasting your time here, then? Why aren't you busy winning on the merits below? Because we are. You know, if there's no violation, there's no violation. You should have won by now instead of wasting your client's money and our time with this issue. Well, because the Court needs to recognize that it takes an enormous step and really overreaches the purposes. This is a chance to teach us a lesson. This is what this is about. I understand. Your client is willing to pay for that. I mean, it sounds to me like you've got an easy win below if what you say is right. If you say, look, there's no violation, we win. Well, that has to do with jurisdiction, and that's why we say there's no jurisdiction for this Court over the Kingdom of Spain or its agency or instrumentality. It is an enormous burden to take a case on the merits in the United States Court, and that's why we place great importance and we place great respect on international relations, foreign relations, and we look very closely at the Foreign Sign of Immunity Act to determine whether or not its purposes are being served here by taking into and pulling into a foreign state or instrumentality that has violated no international law. I didn't see the United States coming with an amicus here on your side. No, they have not come in with an amicus on our side. But with respect to this particular case and these particular situations — There must not be that sensitive a foreign relations matter, a diplomatic matter. Well, in fact — Our government doesn't seem — seems supremely disinterested. Well, you'd have to ask the State Department with respect to that one, Your Honor. Have you? We have not asked the State Department directly, Your Honor, no. But with respect to the — Have you done it indirectly? Excuse me? Have you done it indirectly? We have not done it indirectly. I can't speak to what my client may or may not have done outside of my particular purview. But as Judge — But you don't know of anything? I don't know of anything, Your Honor. But, in fact — Just to clarify one more time the same question Judge Callahan asked, because I still don't — I'm not sure I understand your answer. Do you want the exhaustion requirement to apply only to Germany? No. We believe it should apply both to Germany and it should apply to the Kingdom of Spain to first determine — So the — so what you would want is a rule from this Court saying that for jurisdictional purposes, this plaintiff had to have, what, gotten a determination from Germany as to whether Germany violated international law. With respect to — And then if Germany says, uh-uh, or we've already offered some compensation or something or other, then it would have to — the plaintiff would go and exhaust, what, in Spain? As in any other — The conversion claim or a violation of international law. The conversion claim. He would have to go and pursue his claim, which is founded on the alleged violation of international law. So you do not claim that as a jurisdictional matter the plaintiff needs to exhaust in Spain? No, I do claim that as a jurisdictional matter he does need to exhaust in Spain. He needs to both exhaust — For what? You just told me that what he'd have to exhaust in Spain is the conversion claim. He would have —  I'm sorry, Your Honor. He would have to first explore with Spain whether or not there is a violation of law that either the German government — and if the German government is not going to answer it or has otherwise already addressed it so that we don't have an ongoing — we don't have a violation of international law anymore or seek from the Kingdom of Spain as to whether or not we have a violation of international law with respect to the allegations that are set forth here as they are pled. But he has chosen not to do that. He has chosen instead to use a Foreign Staff Immunity Act exception, a limited exception, which purpose was to hold accountable those foreign states which violate international law so they cannot commit those violations of international law and then hide behind their borders from the jurisdiction of the United States courts. It's important to note the Foreign Staff Immunity Act does not apply only to United States citizens. In the scenario that I opened up with, the ultimate result would be that you would have the U.K., you would have Canada, and you would have Spain all subject to jurisdiction of the United States courts to resolve this dispute. I submit to you that that is not the end intent of the Foreign Staff Immunity Act. Thank you.  Good afternoon. May it please the Court. My name is Stuart Dunwoody, and I represent Claude Cacere. Mr. Cacere regrets that he's not able to be here in person today, but with his age and health, it just wasn't possible. On exhaustion, I believe the Court does not need to decide the issue of prudential exhaustion for two reasons. First, I believe that prudential exhaustion is something that is other than jurisdictional. I think the Sarai opinions make that clear. You said need not. Is that the word you want to use, need not? Well, I suppose that I would say does not have the – on the jurisdictional question, the Court cannot. You do not have the power to. It's a big difference. Yes. You only confuse the issues when you – Right. I'll be more aggressive. So just if the position is we don't have authority? Yes. You need to say that. Are you suggesting by that argument that that is an issue then left to the district court to decide? Let's see. I guess – I don't think there is any – if the Court affirms – My question would be answered yes or no. I'm sorry. Do you think that then is something the district court should decide? Sorry, I'm trying to think it through. I think the – I'm considering prudential exhaustion now. Yes. And we're saying that – and we're talking about whether prudential exhaustion is then just not before us because of collateral – because of the collateral appeal rule? Or is it before us, and it seems to me that you answered Judge Gavincy's question correct, because of the collateral appeal rule, you don't think we have jurisdiction to decide the issue? I only ask you, now does the district court have the – then does the district court have the power, or does it have the ability – the duty to decide the question? I don't see anything that would prevent the district court from considering that. I don't think it's applicable. I think the district court could consider all sorts of other things. Well, if in fact it's a claim of international law, you would agree that exhaustion is – prudential exhaustion is in fact a common law doctrine which has been applied through the ages, would you not? I would agree with that, but I do not agree that prudential exhaustion is part of international law. There is exhaustion of local remedies. But when I say prudential exhaustion, I mean to distinguish that from exhaustion of local remedies. I don't understand. Why are we here from your perspective, then? We're here because the notice of appeal was filed, Your Honor. I'm sorry, I'm afraid I don't understand. Why don't we have jurisdiction to decide, then? You have jurisdiction to decide whether we fall into the jurisdictional category or the immunity exception of property taken in violation of international law. And I think that there is a way that exhaustion might come up in deciding that question. Well, that is, then, do we have pendant jurisdiction to decide whether the FSIA, have expropriation exception requires exhaustion? No, I don't believe they are intertwined, Your Honor. The other reason why I don't believe the Court needs to decide prudential exhaustion is that it was never raised below. I'm sorry, it was raised below. It was not the evidentiary showing was not made below. The Sarai opinions say that the defendant has the burden of showing the availability of local remedies and that those remedies haven't been exhausted. If that showing is made, then the plaintiff has to rebut it. But there was absolutely no factual showing made. There were facts in this record that, in fact, Spain had said, come on over, litigate in our courts, we'd be glad to have you come. I think that's a part of the record. No, I don't believe it is, Your Honor. There is, I believe, an allegation in the complaint that Spain said, if you want it, sue us. I don't think that is a showing that there is a remedy. We're not here on summary judgment. We're here on a motion to dismiss. So if there's an allegation in the complaint that suggests that Spain has, in fact, opened its doors for you to come over and litigate the action, that's all that needs to be made on this motion. No, Your Honor, I think what Spain's response was more, so sue me. And I think when somebody says, you don't like it, so sue me, that is not saying there is a remedy in Spain and that we haven't exhausted those remedies. And I do want to point out that the exhaustion issue in the district court was raised only by Spain. The foundation joined in it on a reply. The foundation never raised it in their appellate briefs, did not raise it at oral argument before the panel. I gather that your approach here and what you want us to do is to say, we don't have appellate jurisdiction over that question. That should go back to the district court to resolve in the first instance. And then if you come to final judgment, they can raise it on appeal. Is that what your position is? That is correct as to prudential jurisdiction. As to prudential exhaustion. Yes. Prudential exhaustion. Not as to the expropriation doctrine and so forth. That's correct. But as to prudential exhaustion, your position is, we don't have appellate jurisdiction. We ought to go back and if they want to raise a factual defense, if they want to claim it's intertwined, that's for the district court to resolve. And I think, unless I misunderstood your answer to Judge Smith, and maybe I did, Judge Smith asked you, shouldn't the district court, does the district court have the power to do that? And your answer is, yes, the district court can make that decision. Then it comes up on appeal later. Is that correct? And the district court has power to consider everything that this Court hasn't ruled on yet. Not necessarily it would be advisable, but it would have the power. We do have authority to decide whether there is an exhaustion requirement as part of customary international law. Yes, Your Honor. And that's where I think. And I don't want to distract you from the line of your argument, but at some point I'd like to discuss that question with you. This may be a good time. Yes, I was actually just about to move there. Well, okay. So let me guide you so that you can understand my question. All right. Or at least my concern in this regard. And I am — are you familiar at all with domestic expropriation law? With which domestic one? Eminent domain. Not very much, Your Honor. Inverse condemnation. It's a good field for you to know something about because there's strong analogies. But at least in domestic international law, you remember the Constitution? It's documented. Yes, I remember. There is no prohibition in the Constitution against governmental takings. There's only prohibition against governmental takings without just compensation. So the government can take so long as it pays you for it. And there is a doctrine in domestic law that says you really don't have a taking, either a physical taking or a regulatory taking, if you have state courts that are open to you to go to seek compensation. Why? Because, well, the state government hasn't really taken a property without compensation if you can go to court and get compensation. Now, if I understand correctly, the international law norm is somewhat the same, although obviously it could very well be different in its details, and that is a government is not prohibited. Like when Cuba took our refinery, the ESO refinery in Guantanamo, the violation was not the taking of the thing. It was the nonpayment of compensation. So if the German courts or the Spanish courts are open for Mr. Cacera to go in and say, you took my property. It was taken. It was my property. It was taken without compensation. Give me the money. Why isn't that part and parcel of any claim of an unlawful expropriation? Your Honor, I think it would be part and parcel when it is like the sort of thing that is done in takings law in the United States. But this isn't it. This isn't one where Germany widened the street in front of Lily's house, took, you know, 10 feet of her front yard and didn't pay her for it. I understand, but, I mean, just to sort of cut to the end, because, you know, my parents collected war reparations from Germany, as I believe some other parents may have and many other people, for various takings and sufferings during the war. And, you know, obviously nobody condones what Germany did, but to their credit they did open up their administrative and legal processes to pay compensation afterwards to those who presented a claim. So why isn't that, even though they don't pay on the spot, and obviously the Nazi regime didn't pay on the spot, the fact that 10 years later they opened their courts and their administrative agencies to these kinds of claims, why isn't that something that has to be exhausted in order for somebody to have a claim of unlawful taking? Because under the way you've put it, Your Honor, then it doesn't become a taking in violation of international law until, you know, it wasn't a taking in violation of international law when Jakob Scheidt-Wimmer insisted that she sell the painting to him. And as part of the campaign of genocide and discrimination, it only became, it would only become a violation of international law when after the war, you know, Germany is defeated, she comes back to Germany, she brings a lawsuit, and she isn't satisfied with the remedies. That's when it would become a violation of international law. And I submit to you that that just seems kind of silly for something where, for genocide. I think that it certainly may make sense when you're talking about 10 feet off of her front yard. Well, I'll put genocide aside because it does raise other issues, but this is a taking of property. And I, you know, in my book I put them in somewhat different categories. I mean, despicable, yes, certainly unlawful if not eventually compensated. But I know of condemnation cases in the United States that go on for 10 or 20 years, where people have their property tied up and they, you know. So the delay in getting paid by one's government for takings is part of life. It's not, it's not, it's not, you don't get instant payments. Right. And I'm just, I'm just wondering, isn't that the kind of thing that customary international law requires before you can say there's a taking? In some instances. And, in fact, Judge, in his, Judge Bybee, in his dissent from the panel in the Sarai case, talks about when is exhaustion of local remedies procedural and when is it substantive. And what Your Honor is saying is, isn't it substantive? Isn't it something where there is no violation of international law until you've tried to exhaust without success? And he says, some people say it is, some people say it isn't, some people say it's both. And he says the United States government, the State's Department, takes the position that exhaustion can be substantive or procedural depending on the initial act or wrong. Yes. Every time the State Department has appeared in the International Court of Justice, it has taken that position. Which position is that, Your Honor? The position is that you have to exhaust a private claim before you can proceed to the International Court of Justice. In the Interhandle case, the United States took that position as opposed to the Swiss, right, and were successful. You know, Your Honor, I haven't made that study. It may well be true. But I submit to you that it may also be the fact that the only sorts of cases that were in the Court of Justice were ones where the State Department agreed, yes, exhaustion is procedural, and that we didn't have ones like this, like ones arising out of human rights violations, where a court would say it was procedural. Well, here this is a property violation. Do you consider that to be a human rights violation? I do. When the property is taken as part of a campaign of racial discrimination, I mean, to the Nazis, they considered Jews a race and considered it to be racial discrimination. And when it's taken in conjunction with that in genocide, yes. As I say, if it was 10 feet off of a front yard, no. Counsel? Oh, go ahead. Pardon me. In Cuba, if there was expropriation, not on a racial basis, but simply on a class warfare basis, expropriation of the bourgeois, that would not be a human rights violation, even though the painting were taken as for a right? I think you're probably right that class warfare would not be, but I haven't really – I don't have a definitive answer for you on that. Judge Gould? Yes, my question is, you know, why isn't 1605A3 ambiguous if it doesn't say property taken by the foreign state, but it also doesn't say property taken by any foreign state? So, you know, why do you contend that it's unambiguous when it seems to have a gap and it neither literally supports the appellant's position or your position? I guess I just don't see ambiguity in it, Your Honor. It says taken in violation of international law. It doesn't say who has to be the one to take it, and I think that there's, you know, the court can, as it did in the THANF and the export group cases, assume that the ordinary meaning accurately expresses the legislative purpose. Mr. Dunwoody, I'd like to return to Chief Judge Kaczynski's question as to why is this case different, if at all, from an ordinary domestic inverse condemnation case. I'm not sure you were listening very carefully when I asked the question of your adversary because it seems to me that it's different in the following sense. In the ordinary case of inverse condemnation, the condemning body has the right to take it by condemnation, assuming that it pays. But in some circumstances, the taker, the government, has no right to take it even if it does pay. And this is a case you made the argument in your red brief. This is a case where the German government had no right to take this, even if it did pay. So this is not at all analogous, which was my point of saying, well, how can this case fit within either of the two examples given by Justice Breyer? Yes, I completely agree. I was listening. I made a mental note to myself to say, as Judge Fletcher said, and did not. Explain to me why you agree. Why do I agree with that? What's so different about this case? Just explain, I mean, explain why it is. It's because... I mean, why can't Germany say Germans will have property, Jews will not? Is that a violation of international law? Yes, it is. Is it a violation of international law if Saudi Arabia says if you are not a Muslim, you can't enter Mecca? I mean, there are laws all over the world that we don't approve of, that we think are despicable. Right. That nevertheless draw distinctions based on race, based on religion, based on ethnicity, based on sex, based on sexual orientation. Yes. Are you with me? I'm exactly with you, but none of those went to the trying to exterminate a group of people. No, I understand. The trying to exterminate part, I am, you know... But let's say they say, look, we think... Again, you must understand, my parents went through this, so I'm not condoning any of this stuff. But they say German people, German Christians can own property, and we don't think Jews can own property. And we'll pay you for it. We're not going to take it away from you and steal it. All these factories, we want them to be in German hands because we might go to war and whatnot, and we will pay you to the penny. Now, is that any different from the laws of Saudi Arabia or Israel or various other countries I could mention that draw distinctions based on religion? And are we really, in the courts of the United States, going to condemn such law, put governments of other nations on trial because they don't fit our notion of what's right? No, Your Honor, because really the bar is pretty high for what constitutes a violation of international human rights. It needs to be something like what went on in Nazi Germany. Well, we take your painting. We take your painting. This is not what's sticking in your gas chamber. I realize other stuff happened, and it's horrible. But we take your painting, or we take your factory, and we think that having the factory in good German Christian hands is in our national interest. And we don't ask Jews to... I mean, again, it's something that no one here would condone, but... It's an interesting hypothetical, but it's not our case. I mean, that's not what happened here. She was not paid fair compensation. It was paid into a blocked account. It wasn't done for a public purpose. It was done for discriminatory reasons. So for all those reasons, it's not the sort of taking of expropriating a sugar mill. I just also wanted to mention that... I'm sorry, but you agree that expropriating a sugar mill, even though on ethnic grounds, would not be a violation of human rights? No, I wasn't saying on ethnic grounds. I was talking about just expropriating a sugar mill because we think that the means of production should be in the hands. And your position would be that any expropriation, even with compensation, if done based on religious grounds, is a violation of international law, customary international law? No, I... I'm not an expert in that field, and I'm willing to take your answer for it. Neither am I, Your Honor. But I didn't have to become an expert in that area because what happened in Germany wasn't just, you know, we don't want Jews owning things and we're going to pay them money. It was we were going to commit a campaign of genocide and systematic racial discrimination against Jews. That is a violation of international human rights law. And so when, as part of that campaign, property is taken, we submit that that's property taken in violation of international law. And we submit that it's a violation from the very moment it occurs, and it doesn't have to wait until 15 years later. You know, you don't have to wait and see, well, did Germany get defeated? Yes, it did, and yes, she went to Germany... So when the government of Israel says we are going to buy these lands owned by Palestinians because we want to have Jewish settlements there, let's say they do that. And we say we're going to pay them. We're going to pay them a hundred cents on the dollar, 110 cents on the dollar. That would be a violation of international law, which we could then we would then customize international law, which we would then litigate in our courts. I don't believe so. That doesn't sound to me like a case of genocide or systematic racial discrimination. It sounds like the Israeli government wanting to house people in a certain area and condemning the property. Whether that's a good idea or not, I haven't formed an opinion on that, and I don't think we need to decide this case. It doesn't seem to me, based on your argument, that you much disagree with the three-judge panel's assessment of the general idea that the Kingdom of Spain is not entitled to immunity. It doesn't seem to me that you have much disagreement with their general idea, then, that there might be some exhaustion requirement that the district court might have to be given on appropriate grounds. Are you saying I do or do not agree with that? Do you agree with that? No, I don't agree. I agree. Your Honor, that was the answer to two of my good colleagues' questions, that you do agree that the district court would have the power. Power, yes, Your Honor. And therefore would have the opportunity to decide that exhaustion question. It certainly would, yes. So therefore, if in fact this is an exhaustion question to be decided, you also would agree, would you not, that we're only talking about prudential exhaustion? Well, we have been talking about the other sort of exhaustion. But what I'm saying is your view. It's my understanding of your view that the procedural exhaustion has been eliminated by the FSIA. If there is procedural exhaustion, as Judge Bybee has outlined in his dissent, that that has been taken care of by the FSIA. If not, it becomes intertwined here and we must determine it. My belief is that to determine whether that at the pleading stage, which is where we are, five years later, we're still at the pleading stage, is we need to decide whether we've made a substantial and non-frivolous allegation of property taken in violation of international law. I submit that the taking that was done by Germany in 1939 was a taking in violation of international law right at that time. Yes, because what? Because it was in violation of international human rights. And as Judge, actually as Your Honor noted in a footnote in the panel decision that the... I hate to be pointed out like that, but go ahead. I thought it was a great opinion except for the last part. I accept that. So, I mean, my worry is, and here we are, the opinion would suggest that the FSIA itself does not require exhaustion, but that because there is a prudential exhaustion in the common law, that one cannot get rid of that prudential exhaustion requirement. It is something the district court has to determine if international law is, in fact, here in this particular case. And then I see the petition that we're now here to see, or the fact that we're here. I'm just trying to see where it is that you then disagree. That idea, given that you cite Judge Bivey's dissent, says procedural exhaustion is probably out of it because the FSIA is the alternative, and we've determined there is no procedural exhaustion given that FSIA alternative. But we have prudential exhaustion still out there, which can be something we can talk about. And I guess I'm still trying to find out what your real argument then is. Okay. And I'm trying to say it. We got into this first, Your Honor, when you asked me about would the district court have power to decide this if this court ruled that it did not have appellate jurisdiction to decide prudential exhaustion. My answer to that is yes. Do I think it's a good idea? No. Do I think prudential exhaustion applies? No. I don't think it should go anywhere near prudential exhaustion. But does the district court have power to do it? Yes, it has power to do that and a lot of other crazy things. I'm sorry. Go ahead. All right. There was a dissent, and you pointed to, Your Honor, here. Well, there was also a dissent in that case. Yes, Your Honor. Does this court have jurisdiction to decide the case as Judge Okuda proposed she would decide it? Yes, I believe so. And what's the basis other than that you would win on everything? Let's see. You know, Judge Okuda said there should be no, you know. Yes, she interpreted that. She interpreted the FSIA to say it's a comprehensive scheme, that there's no, the plain language doesn't require, there's no requirement for exhaustion. The legislative history is such that it supports that there's no exhaustion, that the 1996 amendment regarding terrorism and the canon of expressio unius. And so she said you can't, there's not, you can't find that. Yes, I guess I would agree that if this court says we don't have appellate jurisdiction to decide whether there's, whether prudential exhaustion should apply, then it doesn't have the power also to say, and we've looked at it, and here's why there shouldn't be prudential exhaustion under the FSIA. I think that if you don't have appellate jurisdiction, you probably stop there on prudential exhaustion. I don't follow something there. I'm trying to decide whether if we were to agree with you, what we do is dismiss the appeal for lack of jurisdiction because it's interlocutory and there's no final decision, or whether we first decide that there is or is not a prudential exhaustion or any other kind of exhaustion requirement, and then if we say there is not an exhaustion requirement, dismiss. It seems to me once we get to the point of saying we're talking about prudential exhaustion, that's not a jurisdictional limitation. I agree. So even if we identify the issue, I'm unclear on how we get to decide the issue. All right. So here's how I think it would happen. You would say Spain appealed saying we're immune. Spain and the foundation appealed saying we have immunity. You affirm the judgment below saying that the court properly said that this action falls within 1605A3, and if you feel that you need in determining whether we've shown that there are rights and property taken in violation of international law in issue, if you need to decide was this really taken in violation of international law, we need to figure out if there was exhaustion. That's the one place that exhaustion would come in. But if you say we don't need exhaustion to figure out was it taken in violation of international law, instead there's this exhaustion requirement that ought to be bolted on to the FSIA like it is in the alien court statute, and I don't think that you have appellate jurisdiction to do that, because I think that bolting on of prudential exhaustion is not a jurisdictional issue, and therefore you don't have appellate jurisdiction. Well, let's suppose, for example, that the district court had gone the other way and said that you need to exhaust and I'm going to stay proceedings while you exhaust. Do you think we'd have appellate jurisdiction over the stay order? I'm sorry. The district court said that we did need to exhaust. We did need to exhaust by going to Spain. But instead of dismissing it, in which case we would have jurisdiction, the district court just enters a stay order and says go exhaust and come back and see us. And you say, well, we don't have to exhaust. I want to take that up on appeal. Do you think we would have jurisdiction over that? And if you think we would, then why doesn't the same logic apply to Spain here? You know, that doesn't sound to me like something that fits within the collateral order doctrine, and, you know, it's been a while since I – you know, I know that denial of sovereign immunity fits within it. I know some other things that fit within it. Whether that would fit within it, I don't know, but my gut reaction is no, it doesn't. Okay. Thank you. Thank you, Your Honor. I think you are over your time. Would you like a minute for rebuttal? Yes. The court in laying out various scenarios, the Palestinians, the Israelis, the other conflicts that are going on across the world, opens up the very question of what is the purpose of the Foreign Sovereign Immunity Act expropriation exception. If you do not limit it to the violator of international law and you expand it to any foreign state or agency who may come across property, whether now or 100 years from now, and use that as a wide-open net to turn the U.S. courts into courts of jurisdiction to resolve disputes, whether they're between U.S. citizens, whether they're between internationals, or whether they're between the foreign sovereigns, I would submit to you to completely eviscerate the Foreign Sovereign Immunity Act. You turn it into a sword and not a shield. You do away with the presumption of immunity, and you impede or you step into the role of the international courts. The United States does not subject itself to jurisdiction of the International Criminal Court since 1986, for the very reason that it does not want to enter into the international domain of criminal jurisdiction. Our taking jurisdiction over the Kingdom of Spain and an agency or instrumentality of it, when it has committed no acts, it should apprise itself of the fact that it is exposing itself to the U.S. court jurisdiction I say runs afoul of the Foreign Sovereign Immunity Act's very purposes. If there's any other questions, I would be happy to address them. Thank you. Thank you. Our cases are here. We can submit it. We are adjourned.
judges: Kozinski, Rymer, Kleinfeld, Thomas, Silverman, W. Fletcher, Gould, Paez, Callahan, Bea, N.R. Smith